IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| KIARA O'FARRILL-CORREA and JOHN PAUL GONZALEZ-GONZALEZ, on their own behalf and in representation of baby KENNYALIS GONZALEZ-O'FARRILL<br><br>    Plaintiffs<br><br>      vs.<br><br>HIMA SAN PABLO CAGUAS; DR. LUIS CORREA JIMENEZ, his wife JANE DOE and the conjugal partnership formed between them; CENTRO OB/GYN ALFONSO-CORREA; GRUPO NEONATAL CSP; DRA. BASILISA RIVERA, her husband JOE DOE and the conjugal partnership formed between them; SIMED; COMPANIES A-Z; JOHN DOE; PATTY POE<br><br>    Defendants | CIVIL NO.<br><br>PLAINTIFFS REQUEST JURY TRIAL |

## COMPLAINT

**TO THE HONORABLE COURT:**

**COME NOW** plaintiffs, through the undersigned legal representation, and very respectfully STATE, REQUEST AND PRAY:

JURISDICTIONAL ALLEGATIONS

1.    This Honorable Court is vested with jurisdiction over the parties and the subject matter of this litigation under and pursuant to the diversity of citizenship statute (Section 1332 c) of Title 28 of the United States Code, 28 U.S.C. §1332), inasmuch as there is complete diversity of citizenship between the Plaintiffs, as residents of the State of Pennsylvania and the defendants, residents of the Commonwealth of Puerto Rico, and the amount in controversy, exclusive of costs and interest, exceeds the amount of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00). As more specifically alleged

below, all Defendants are domiciled and permanent citizens of Puerto Rico within the meaning of 28 U.S.C. §1332 and all Plaintiffs are domiciled and permanent citizens of a state of the United States of America other than Puerto Rico.

2.      Venue is proper in this Court pursuant to Section 1391 of Title 28 of the United States Code, 28 U.S.C. §1391, because the claims asserted arose in this judicial district.

3.      Plaintiffs demand a jury trial.

4.      All codefendants are jointly and severally responsible to plaintiffs for the damages suffered by them.

<u>THE PARTIES</u>

5.      Co-plaintiffs KIARA O'FARRILL-CORREA (hereinafter "KIARA") is 20 years old and was born on April 20, 1996.  She is the common law wife (not legally married) of co-plaintiff JOHN PAUL GONZALEZ-GONZALEZ (hereinafter "John Paul") who is also 20 years old, born on December 5, 1995.  Both live together and are permanently resident, citizens and domiciled in the State of Pennsylvania, with residential address at 4046 Hidgebee St., Philadelphia, Pennsylvania 19135.  Upon moving to Pennsylvania, they became of legal age as in Pennsylvania 18 years old is the legal age. Co-plaintiff KENNYALIS GONZALEZ-O'FARRILL (hereinafter "KENNYALIS") is Kiara and John Paul's daughter born on February 21, 2015 and lives with them in the same address.

6.      Co-defendant DR. LUIS CORREA JIMENEZ (hereinafter "DR. CORREA") is a physician duly authorized in the Commonwealth of Puerto Rico with specialty in obstetrics and gynecology who provided medical services to Kiara and Kennyalis.  He is married to JANE DOE, with whom he has a conjugal partnership.

7.      Codefendant CENTRO OB/GYN ALFONSO-CORREA, which is a legal entity or a commercial name upon which they have a medical practice for the practice of Obstetrics and Gynecology which employed Dr. Correa.  At all times relevant to the facts of this case Dr. Correa had medical privileges at codefendant HIMA San Pablo Caguas Hospital in Caguas, Puerto Rico and had a private office located in Urb. Santa Juana II S-2, Ave. Luis Muñoz Marín Puerto Rico under the name of CENTRO OB/GYN ALFONSO-CORREA.

8.      Codefendant HIMA SAN PABLO CAGUAS ("HIMA") is a legal entity or a commercial name of a private hospital in Caguas, Puerto Rico. HIMA is the juridical entity that is the owner, in whole or in part or is the manager and/or administrator and/or is the commercial or corporate name of a healthcare facility located in Caguas, Puerto Rico that offers services to the public. HIMA is also the employer or contractor of all other codefendant, for whom it is vicariously and jointly and several responsible.  HIMA also extended privileges to co-defendant's DR. CORREA and DR. RIVERA.

9.      Codefendants GRUPO NEONATAL, CSP (hereinafefer "GRUPO NENONTAL") is a Puerto Rico corporation that at all times subject of this case the employers and/or contractors of some or all codefendant neonatologists that worked at HIMA. GRUPO NEONATAL was granted by HIMA an exclusive contract to provide the neonatology services in the hospital. Plaintiffs did not choose GRUPO NEONATAL or Dr. Basilisa Rivera as their neonatology services, they were chosen by HIMA.

10.     Codefendant DR. BASILISA RIVERA (hereinafter "DR. RIVERA), is married to JOE DOE and forms a conjugal partnership with him.  She is a pediatrician and/or neonatologist of GRUPO NEONATAL that was employed by and/or contracted

and afforded medical privileges at HIMA and that provided medical care to KENNYALIS upon birth and in the neonatal intensive care unit.

11.     Codefendant SINDICATO DE ASEGURADORES DE IMPERICIA MEDICA (hereinafter "SIMED") is an insurance company authorized to do business in Puerto Rico, which at the time of the facts alleged in this complaint had in full force and effect an insurance policy covering the damages alleged in this complaint and the responsibility of codefendant physicians. SIMED is deemed to reside in Puerto Rico within the meaning of 28 U.S.C. §1332.

12.     COMPANIES A-Z are legal entities that at the times relevant to these facts owned, operated, managed, and/or administered, in whole or in part, and were solely or partially responsible for the administrative and medical issues of any of the codefendant's medical entities to provide all or part of the medical and/or administrative services.  In the alternative, they are other legal entities that caused or contributed to causing the damages to plaintiffs. Also, and in the alternative, they are insurance companies which at the time the facts of this case took place had in full force and effect insurance policies in favor of codefendants.

13.     CODEFENDANTS JOHN DOE and PATTY POE are all codefendants of unknown identity that caused and contributed to causing plaintiffs damages.  Their identities will be revealed once they are known through discovery.

14.     All of the named defendants are jointly and severally responsible to plaintiffs for the damages caused to them. All defendants fictitiously named herein, will be correctly named once their identities are determined.

## THE RELEVANT FACTS

15.     Kiara had entrusted her prenatal care of Kennyalis to Centro OB/GYN Alfonso-Correa, whom assigned one of its physicians during Mrs. Kiara's pregnancy and delivery, since she knew she was pregnant. Kiara went to all her 13 prenatal care appointments at Centro OB/GYN Alfonso-Correa that began on July 23, 2014.

16.   According to the prenatal records, her pregnancy developed without any problems, this was her first pregnancy, she had no medical conditions, and was in good health.

17.     At approximately 3:00 a.m. of February 21, 2015, Kiara arrived directly to the Emergency Room of HIMA San Pablo Caguas, due to the fact that she was feeling contractions.   According to triage notes in the emergency room, she was already full term, 39 ½ weeks into her gestation.

18.     While at HIMA's Emergency Department she waited for one hour and ten minutes until 4:10 a.m., when she was admitted to the hospital and transferred from the Emergency Department to the Labor & Delivery Room and Dr. Benes was notified at 4:30 am. According to the medical record Dr. Benes evaluated the patient upon admission.

19.     According to the medical records Mrs. Kiara was placed on continuous electronic fetal monitoring from 4:30 a.m. through 12:00 midnight of the next day.  That same day, at or around 7:00 a.m., Dr. Benes ordered an OB Sonogram due to intrauterine pregnancy 39 weeks with pelvic pain and uterine contractions.

20.     The medical notes of HIMA stated that at or around 2:20 p.m. of February 22, 2015, Dr. Benes ordered Demerol 25mg and Phenergan 25 mg.

21.     On that same date at or around 7:00 pm, Dr. Correa ordered Pitocin 10 units 500 ml, Demerol 50 mg, Phenergan 50gm IM STAT and oxygen. This was in complete disregard of the standard of care, since there was no medical need for the use of Pitocin on this patient.

22.     In accordance with the medical record at 9:00 p.m., Dr. Correa ordered the administration of Ampicillin IV. The nurses' notes at 12:00 a.m. of February 23, 2015, the nurses describe the patient as in 10 centimeters dilatation (fully dilated).

23.     The medical records reflect that at 12:00 midnight, Dr. Correa ordered the nurses to remove the electronic fetal monitors, although the baby had not been delivered yet. Clearly this was another deviation from the standards of care, since there was no reason to stop monitoring the wellbeing of baby Kennyalis especially upon the administration of Pitocin.

24.     The nurses' notes at this time recognized that the contractions on the tracings were mostly "moderate" and "strong".

25.     The following vaginal exams made by the nurses to Kiara on February 21, 2015:

> -At 4:00 a.m., FHR 144, moderate contractions, dilatation 2, station 403, membrane -3;
>
> -At 4:40 p.m. +1 FHR, 3/80/-2/ Vx dilatation and effacement;
>
> -At 7:20 p.m. =1 FHR, regular contractions, 4/90/-2vx dilatation and effacement;
>
> -At 11:30 p.m. FHR =1, regular contractions, 9/90/-1/vx dilatation and effacement;
>
> -At 12:00 a.m. =1 FHR. Regular contractions, 10/100/0/vx/

26.     On February 22, 2015, Baby Girl Kennyalis was born at or around 1:14 a.m. with a recorded weight of 6 pounds 13 ounces and 20 ¼ inches long. She was

born from spontaneous labor through a vagina delivery and an episiotomy.  The delivery notes referees to two (2) milliliters of meconium were found in the amniotic fluid.

27.   According to Kiara an odd method was utilized during her delivery; she vividly describes this method as tying up one corner of the bed sheet to the guard rails of the bed and pulling down the other end of the sheet over Kiara's belly to push down or force the baby out. This barbaric method applied exercise and unmeasured traction, and fundal pressure force to the undelivered baby that was still inside the mother. Clearly, this was another deviation from the standards of care as said type of traction or pressure should never be used on a delivery especially when it's unmeasured. Said deviation from the standards of care is directly linked to Dr. Correa and the nursing staff whom applied said method in clear and direct violation of the standards.

28.   According to the delivery note Baby Girl Kennyalis was described as; did not cry, was pale, hypotonic, and had no profound reflexes, requiring manual stimulation.  Neonatologist co-defendant Dr. Rivera received the patient in the delivery room and intubated the baby who had an oxygen saturation level of 77% and took her to NICU.  Kennyalis' APGAR scores were described as 3 at 1 minute, 6 at five minutes, and 7 at 10 minutes.

29.   A cord blood gas drown from the umbilical cord and taken at birth was analyzed at 1:57am.  It reflected that the baby's pH level was 6.862 when the normal is 7.2-7.45; PCO2 at 117.9 when the normal is 35-70; PO2 of 21.2 when the normal is 70-100; a base excess of -14.2, all of which describes a profound metabolic acidosis.

30.   All the above values were reported as "panic" values.  The only cause of these panic values was that severe episodes of hypoxia/ischemia were caused to the baby right before birth. These severe episodes of hypoxia/ischemia caused this baby to

suffer a hypoxic/ischemic encephalopathy, which is permanent, irreversible and irreparable brain damage.

31.    The neonatologist that received Kennyalis in the delivery room, co-defendant Dr. Rivera, described the baby upon birth as flaccid, with pale skin color, with bag & mask positive pressure ventilation and endotraqueal intubation in delivery room, with large caput, intact palate, poor respiratory effort, with crackles bilaterally, hypotonic extremities, absent reflexes at birth and gradually increasing primitive reflexes.

32.    Notwithstanding, said descriptions of baby Kennyalis, Dr. Rivera failed to order a head cooling treatment to avoid further damage as a result of the hypoxic/ischemic encephalopathy. Said deviation from the standard of care was noted by the subsequent neonatologist whom made a note stating that the window for cooling therapy had passed.

33.    On February 22, 2015, the neonatologists at HIMA diagnosed that Kennyalis had suffered a Hypoxic Ischemic Encephalopathy and was now suffering from neonatal seizures.

34.    On February 24, 2015, two days after her birth, pediatric neurologist Dr. Antonio R. Gonzalez-Santos evaluated the patient, and diagnosed that the baby had suffered a hypoxic ischemic encephalopathy and neonatal seizures and ordered a brain CT and an EEG.

35.    Dr. Gonzalez-Santos re-evaluated the patient on February 28, 2015 and found the patient's neurological exam unchanged since February 24, 2015.   He described that the CT and a brain MRI showed a hypoxic ischemic encephalopathy, hence, reaffirming his diagnosis of Hypoxic Ischemic Encephalopathy and also found that the baby's prognosis was guarded.

36.     Dr. Gonzalez-Santos re-evaluated the patient on March 14, 2015 and reaffirmed his previous diagnoses. According to his notes the baby had had myoclonic seizures for which Luminal was administered.

37.     During Kennyalis' 3 month stay at HIMA's NICU, many doctors were consulted in light of her multi-organ damages; including but not limited to pediatric cardiologists, pediatric ophthalmologists, pediatric pulmonologist, speech therapists and physical therapists.

38.     The medical reflects that due to poor sucking caused by the brain damage the Kennyalis had to be fed through a nasal tube. In order to handle Kennyalis lives times nutrition, a gastrostomy tube was placed on Kennyalis.

39.     HIMA medical records show that while in NICU the Kennyalis contracted bacteria *Enterobacter Aerogene* from the hospital for which she had to receive antibiotic treatment.

40.     The neonatologist group placed a consultation to a neurologist, Dr. A. Canales, who after evaluating the patient diagnosed that the Kennyalis had suffered a hypoxic ischemic encephalopathy intra partum and neonatal seizures. Pediatric neurologist Dr. Gonzalez-Santos re-evaluated the patient on May 1, 2015 and reconfirmed his initial diagnoses of hypoxic ischemic encephalopathy and neonatal seizures.

41.     The following medical text and evaluations were performed to confirm Dr. Gonzalez Santos evaluation:  a CT of head and an MRI, which showed a large cerebral edema and, an EEG showed very low voltage with dysfunction of both sides of the brain consistent with a hypoxic anoxic encephalopathy.

42. Clearly, the test above described confirmed Dr. Gonzalez Santos initial evaluation that baby Kennyalis had suffered and intra partum hypoxic ischemic encephalopathy.

43. According to the medical records during her stay at Hospital HIMA Kennyalis suffered myoclonic seizures due to her brain damage consistent with a hypoxic anoxic encephalopathy that required the administration of Luminal.

44. On March 18, 2015, pediatric gastroenterology specialist, Dr. Jorge A. Rosario Mulinelli, diagnosed that the baby had suffered intrauterine hypoxia that caused poor sucking ability and coordination. Furthermore, a brain MRI performed on February 27, 2015 concluded that the imaging were consistent with a hypoxic ischemic injury, with abnormal signal intensity, involving the putamina and lateral thalamy bilaterally.

45. Pediatric neurologist, Dr. Jocelyn Montalvo-Ortiz, referred Kennyalis to a neurosurgeon due to a diagnosis of hypoxic ischemic encephalopathy, neonatal seizures, global developmental delay, and acquired microcephaly.

46. The medical records of codefendant HIMA Caguas demonstrate that Kennyalis remained in NICU for 3 months, from February 22 until May 18, 2015. The records also demonstrate that all the infection cultures performed to Kennyalis were negative, and the C reactive protein was at 5.9, when normal results are 0-10. Moreover, the medical records confirm no evidence that Kennyalis suffered from a genetic condition and/or mutation.

47. Kennyalis' multiple medical conditions caused by her hypoxic anoxic encephalopathy have required multiple visits to the emergency room and stays at the hospital:

a. Emergency department visits

- July 12, 2015 due to vomits

- July 23, 2015 due to respiratory difficulty

- July 24, 2015 due to respiratory difficulty

- August 25, 2015 due to decreased voiding

- September 29, 2015 due to obstructed gastrostomy

- November 7, 2015 due to fever

- November 5, 2015 due to fever

- November 29, 2015 due to cough

b. Admissions

- July 27-31, 2015 due to vomiting

- August 12-21, 2015 due to sepsis and gastroesophageal reflex

- October 5-30, 2015 due to failure to thrive and change of gastrostomy

- December 6-14, 2015 due to bronchopneumonia

- January 3-4, 2016 due to choking episode and dehydration

- January 12-28, 2016 due to pneumonia

FIRST CAUSE OF ACTION: OBSTETRICAL MEDICAL NEGLIGENCE

48.   All codefendants provided substandard medical treatment to Kiara and Kennyalis that caused and/or contributed to causing the damages to plaintiffs.  The medical treatment that codefendants provided to them fell well below the standards of medical attention that in view of the modern means of communication and, according to

the knowledge of science and the prevailing practice of medicine satisfies the requirements generally recognized by the medical profession.

49.   Specifically, Dr. Correa, the physicians and nursing staff at HIMA were negligent in 1) failing to adequately monitor the patient; 2) failed by withdrawing the electronic fetal monitoring from the patient before the baby was born and during the last phase of active labor; 3) failed by administering Pitocin which was contraindicated and compounded the excessive uterine activity; 4) failed by not monitoring the administration of Pitocin and by not removing it; 5) failed to identify excessive contractions and uterine activity; 6) failed to avoid head mechanism compression; 7) failed by adding or ordering inadequate fundal pressure; 7) failed to properly asses the contractions; 8) failed to avoid the baby's head trauma due to head compressions from the strong and excessively frequent contractions; 9) failed to promptly and properly deliver the baby.

SECOND CAUSE OF ACTION: HOSPITAL NEGLIGENCE

50.   Codefendant HIMA is jointly and severally responsible for all the damages caused to plaintiffs. First, HIMA is directly and vicariously responsible for all the negligent acts of its personnel. Regardless of the fact that the nurses and other physicians of the hospital knew or should have known that Kiara was suffering from excessive uterine activity, they 1) inappropriately administered Pitocin to the mother; 2) failed to monitor the mother and the baby every 15 minutes during the administration of Pitocin; 3) failed to inform the OB/GYN's of Kiara's excessive uterine activity; 4) failed to properly asses the contractions; 5) caused additional head damage and trauma by applying fundal pressure; 6) failed to avoid head mechanism compressions; 7) failed to seek the prompt and proper delivery of the baby.

51.     HIMA is directly responsible for the negligent acts of Dr. Correa to whom medical privileges for the practice of obstetrics and gynecology were negligently provided.

52.     HIMA is directly responsible for the neonatologist Dr. Basilisa Rivera negligence of not offering or ordering head cooling to this patient.

53.     HIMA is directly responsible of the negligent acts and/or omissions of their nursing personal that departed from the standard of care in the treatment provided to plaintiffs.

<u>THIRD CAUSE OF ACTION: NEONATOLOGIST'S NEGLIGENCE</u>

54.     HIMA is also directly responsible for the negligent acts of the neonatologist codefendant Dr. Basilisa Rivera and Grupo Neonatal CSP and other doctors that it provided for the care of Kennyalis.  Dr. Rivera was not chosen by Kiara, but supplied by HIMA Dr. Rivera among other things Kennyalis failed to consider and/or refer Kennyalis for head cooling.  Within a medical degree of medical certainty, if head cooling would have been provided to this baby, the magnitude and extension of the permanent brain damages would have been up to 50% less.

<u>DAMAGES</u>

55.     The proximate and sole cause of plaintiffs' damages was the medical and individual negligence of defendants. As a direct consequence of defendants' substandard medical treatment provided to plaintiffs, Kennyalis is totally and permanently disabled.  Kennyalis cannot complete any activities on her own.  She cannot walk, talk, crawl, stand up, move her head or her body, see, hear partially, taste or perform any other basic activity of daily human living.  Kennyalis requires 24/7 care and attention. She is fed via a gastric tube and her throat secretions have to be

constantly suctioned. As a result of her brain damage, Kennyalis suffers daily convulsions, even though she in under anticonvulsive medication.  Kennyalis suffers severe developmental and intellectual delay and deficiencies. She has no attention span due to her blindness, but has quick auditory reactions, especially to music. Kennyalis has renal and hematological problems and constantly need to be taken to many specialists. Kennyalis requires several weekly sessions of physical, occupational and speech therapy. She will most probably also require brain surgery for the placement of a VP Shunt, so that the liquid trapped in her brain due to her severe hydrocephalus caused by the anoxic episode could be drained out. She cannot drink any water as she will choke and aspirate.

56.    Kennyalis damages were caused solely by codefendants negligence and any genetic origin of her conditions has been ruled out by all the tests performed by genetic specialists.

57.    Kennyalis needs constant medical attention, treatment and equipment.  It is estimated that the medical care, treatment and equipment being received by Kennyalis in Pennsylvania is expected to continue and to increase with the onset of new medical conditions and with the progress of existing conditions.  With an average life expectancy, these damages are expected to increase to no less than twenty million dollars ($20,000,000.00).

58.    Kennyalis is suffering grave emotional damages as she can discern that she is trapped inside an incapable body.  With the passing of time, this will cause her depression, suicidal thoughts, and despair.  These emotional damages are valued in a sum of no less than five million dollars ($5,000,000.00).

59.    Kiara and John Paul have devoted themselves to the round-the-clock attention of Kennyalis.   She cannot work full time and is expected that she will lose earning of no less than $750,000.00 throughout her life. They have lost their normal life and due to codefendant's negligence, are caught inside a never-ending cycle of physician offices, medical tests and medications for Kennyalis.   Undoubtedly, they are also suffering grave emotional damages that are worth no less than five million dollars ($5,000,000.00) each.

**WHEREFORE**, it is respectfully requested from this Honorable Court to grant all allegations in this complaint for plaintiffs and against defendants with the imposition of costs, treble damages, interest and a reasonable amount of attorney's fees.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 15 day of September, 2016.

PEDRO F. SOLER-MUÑIZ
USDC/PR NO. 212,909
ATTORNEYS FOR PLAINTIFFS
1357 Ashford Avenue, PMB 106
SAN JUAN, PR 00907
TEL. 787-774-6522; FAX 787-706-8680
psoler@pedrosolerlaw.com